Filed 4/9/15  Cesar Chavez High School Cases CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Marin & San Joaquin)

----

| | |
|---|---|
| CESAR CHAVEZ HIGH SCHOOL CASES. | C070185 |
| | JCCP No. 4509 |
| | (Marin Super. Ct. No. CV064561) |
| | (San Joaquin Super. Ct. Nos. CV029171, CV031143, CV031470) |
| | ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION |
| | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on March 17, 2015, be modified as follows:

The last sentence of part III. of the Discussion, which precedes footnote 5 on page 13, reads:

> We reverse the order granting Braun the prejudgment writ of attachment.[5]

1

Footnote 5 on page 13, as filed, reads:

> [5] Given our reversal of the attachment order on the ground the trial court should have stayed the attachment proceedings pending the appeals of the indemnity judgment and the arbitration denial, we need not address West Bay's other contentions for reversing this order.

Insert the following sentence at the end of footnote 5:

> Also, given this reversal of the attachment order, the trial court can consider the issue of the correct amount of the undertaking for the (now reversed) writ of attachment, and the issue of damages, if any, arising from this reversed writ of attachment; furthermore, the trial court can entertain, if appropriate, new proceedings regarding a new prejudgment writ of attachment.

so that footnote 5 now reads in full:

> [5] Given our reversal of the attachment order on the ground the trial court should have stayed the attachment proceedings pending the appeals of the indemnity judgment and the arbitration denial, we need not address West Bay's other contentions for reversing this order. Also, given this reversal of the attachment order, the trial court can consider the issue of the correct amount of the undertaking for the (now reversed) writ of attachment, and the issue of damages, if any, arising from this reversed writ of attachment; furthermore, the trial court can entertain, if appropriate, new proceedings regarding a new prejudgment writ of attachment.

The petition for rehearing of appellant West Bay Builders, Inc., is denied. There is no change in judgment.

BY THE COURT:

_____ROBIE_____, Acting P. J.


_____BUTZ_____, J.


_____MURRAY_____, J.

kFiled 3/17/15 (unmodified version)

<u>**NOT TO BE PUBLISHED**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Marin & San Joaquin)

----

| | |
|---|---|
| CESAR CHAVEZ HIGH SCHOOL CASES. | C070185 |
| | JCCP No. 4509 |
| | (Marin Super. Ct. No. CV064561) |
| | (San Joaquin Super. Ct. Nos. CV029171, CV031143, CV031470) |

When issues arose concerning the construction of a high school in Stockton, the general contractor and various subcontractors started finger-pointing, their lawyers followed with lawsuits, and the Judicial Council eventually coordinated the actions in the San Joaquin County Superior Court.

1

This appeal involves the general contractor, an electrical subcontractor, and an electrical supplier. The general contractor appeals from a judgment, from the first trial phase, denying it indemnity from the subcontractor; and also appeals from three orders (one denying arbitration, another granting attachment concerning the second trial phase, and the third deeming satisfied a stipulated judgment between the subcontractor and the supplier). (Code Civ. Proc., §§ 904.1, subd. (a)(1), (2) & (5), 1294, subd. (a) [appealability of these three orders].)

We find merit in the general contractor's attachment appeal, but otherwise shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Parties and Events Leading to the Appeals Here*

In March 2003, West Bay Builders, Inc. (West Bay), a general contractor, contracted with the Stockton Unified School District (the District) to build Cesar Chavez High School in Stockton.

Shortly thereafter, West Bay entered into a $4.366 million subcontract with Braun Electric Company, Inc. (Braun).

Braun, in turn, executed purchase orders with Graybar Electric Company, Inc. (Graybar) to furnish electrical materials.

In 2004, payment and supply issues arose among West Bay, Braun, and Graybar, culminating in Braun filing a "Stop Payment Notice" (Stop Notice).[1]

---

[1] To secure payment for work owed on a public project, a subcontractor or a supplier may file a Stop Notice with the project owner, which obligates the owner to withhold from the general contractor the amount claimed in the Stop Notice. (Civ. Code, § 9358.) Also, a subcontractor or a supplier may sue for payment on a "payment bond" that the general contractor has obtained. (Civ. Code, § 9550.)

2

To resolve these issues, West Bay, Braun and Graybar entered into a "joint check agreement." West Bay would issue checks payable jointly to Braun and Graybar; and, as Braun and West Bay agreed later, West Bay would detail what those checks covered.

Beginning in 2005, a dispute arose between West Bay, Braun and Graybar concerning a payment to Graybar under the joint check agreement. Graybar claimed it was owed $259,000 (numbers rounded for simplicity). Braun disputed $73,000 of this amount. West Bay issued two checks payable jointly to Braun and Graybar totaling $259,000, but these two checks did not detail what they covered. Because it disputed $73,000 of the $259,000 Graybar claimed, Braun did not endorse, cash, or deliver the $259,000 checks to Graybar. In June 2005, Graybar filed a Stop Notice for $259,000.

In January 2006, West Bay's counsel demanded, in writing, that Braun resolve the June 2005 Graybar Stop Notice/payment issue within 48 hours. Braun objected, claiming that Graybar was not owed $73,000 of the $259,000 recited in Graybar's Stop Notice. Braun proposed—in a proposal acceptable to Graybar—that West Bay issue a joint check for the undisputed $186,000 and a check to Graybar's counsel, to be held in trust, for the disputed $73,000, to allow Braun and Graybar to resolve the dispute, and have Graybar release its Stop Notice. West Bay refused to do so.

Meanwhile, in February 2006, the District informed West Bay that it would make no further payments to West Bay until water intrusion problems were resolved. In May 2006, the District withheld $3.6 million along these lines.

In April 2006, and with an amendment a year later, Graybar sued West Bay and its respective sureties for $259,000 (principal amount) on West Bay's construction bonds. West Bay, in turn, cross-complained against Braun for indemnity under their subcontract (and related causes of action). Braun completed the lawsuit trilogy by cross-complaining against West Bay and Graybar.

In October 2007, after resolving their dispute over Graybar's $259,000 payment claim, Braun and Graybar stipulated to judgment in favor of Graybar and against Braun for the principal amount of $243,000.

## B. *West Bay's Appeal of the Indemnity Judgment*

In 2011, the coordinated proceeding was phased for trial. "Phase 1" was a bench trial involving (1) Graybar's complaint against West Bay for the principal amount of $259,000 for the electrical materials Graybar had supplied, and (2) West Bay's cross-complaint against Braun for indemnity.

The trial court ruled for Graybar on its complaint for the principal amount of $243,000 (as noted, in their stipulated judgment, Braun and Graybar had reduced Graybar's $259,000 claim to this amount). And the trial court ruled against West Bay on its indemnity cross-complaint. In a nutshell, the trial court found that Braun repeatedly directed West Bay to issue payment jointly to Braun and Graybar (pursuant to the Braun-Graybar proposal noted above), but West Bay inexcusably failed to do so. As noted in more detail below, West Bay and Graybar then settled on appeal, leaving only the cross-complaint indemnity judgment in favor of Braun and against West Bay as the judgment on appeal here.

## C. *The Three Orders Being Appealed by West Bay*

### 1. The appeal of the order denying arbitration.

Nearly a year after the Phase 1 trial—and after West Bay had appealed the Phase 1 judgment—"Phase 2" began. Phase 2 involves Braun's claim of delay damages against West Bay. After a jury was empanelled, and alternate jurors were deployed at a rapid pace, the trial court declared a mistrial, fearing the lack of jurors to complete Phase 2. West Bay then moved unsuccessfully to compel Braun to arbitrate Phase 2 pursuant to their subcontract, and has appealed here this arbitration denial order.

4

2.  The appeal of the order granting attachment.

In September 2012, while West Bay's appeals of the Phase 1 judgment and the arbitration denial were pending, Braun obtained from the trial court a Phase 2 prejudgment writ of attachment against West Bay in the amount of $695,000 (number rounded for simplicity).  West Bay appeals here from this order.

3.  The appeal of the order finding the Braun-Graybar
    stipulated judgment satisfied.

Finally, West Bay and Graybar settled on appeal that portion of the Phase 1 judgment involving them (i.e., Graybar's judgment on its complaint against West Bay), with West Bay paying Graybar $950,000 and Graybar assigning West Bay its $243,000 (principal amount) stipulated judgment against Braun.  Braun, in turn, then moved successfully to deem Graybar's $243,000 stipulated judgment against Braun satisfied given that West Bay's $950,000 settlement payment to Graybar included the $243,000 principal amount (the difference between the $950,000 and the $243,000 covered interest, costs, and attorney fees).  West Bay appeals here from this satisfaction order.

We will set forth additional pertinent facts in discussing each appeal.

## DISCUSSION

### I.  The Trial Court Properly Denied West Bay's Cross-complaint for Indemnity from Braun (for Graybar's Complaint Against West Bay)

#### *A.  Background*

The West Bay-Braun subcontract contained two indemnity provisions, Paragraphs B and G.

Paragraph B stated as pertinent:

"**INDEMNITY PROVISION** – All work covered by this Agreement at the site of construction or in preparing or delivering materials or equipment, or any or all of them, to the site, shall be at the risk of [Braun] exclusively.  [Braun] shall, with respect to all work, which is covered by or incidental to this Agreement, indemnify and hold [West

5

Bay] harmless for any claim or loss as a result of [Braun's] work. However, [Braun] shall not be obligated under this Agreement to indemnify [West Bay] with respect to the sole negligence or willful misconduct of [West Bay] . . . ."

And Paragraph G added as relevant:

"**LIENS** – [Braun] shall at all times indemnify and hold [West Bay] . . . harmless against all liability for claims and liens for labor performed or materials used or furnished to be used on the job by any second-tier supplier and material-men . . . . [Braun] agrees within ten (10) days after written demand to cause the effect of *any* legal proceedings or liens to be removed from the premises . . . ."

The trial court concluded that Paragraph B was inapplicable because (1) West Bay's indemnity claim was not " 'as a result of' Braun's work," and (2) relatedly, West Bay made a "willful and intentional decision not to pay Graybar."

The trial court also denied indemnity under Paragraph G, ruling that (1) West Bay was "equitably estopped" from amending its cross-complaint to rely on this provision given West Bay's almost exclusive reliance on Paragraph B (raising Paragraph G only at the last minute in the Phase 1 litigation), and (2) West Bay failed to make the requisite Paragraph G written demand on Braun.

### B. Analysis

West Bay argues that since Graybar's successful complaint against West Bay (for the payment of electrical supplies, in the principal amount of $243,000) was, in the ordinary language of Paragraph B, "as a result of [Braun's electrical subcontract] work," the trial court had to sustain West Bay's indemnity cross-complaint against Braun. Adding Paragraph G to this mix—which the trial court, West Bay asserts, abused its discretion in not allowing West Bay to amend to its indemnity cross-complaint—only further added to this straightforward conclusion.

6

The problem with West Bay's argument is that it proceeds so straightforwardly it misses a significant detour in the indemnity relationship of West Bay, Braun and Graybar: their joint check agreement, undertaken to resolve and avoid billing disputes between the three parties by providing checks jointly payable to Braun and Graybar; and, pursuant to corresponding agreement, by specifying what each check covered.

The billing dispute comprising the West Bay-Braun-Graybar Phase 1 litigation was Graybar's 2005 claim for the principal amount of $259,000. Graybar succeeded in its complaint against West Bay on this claim (for $243,000, mirroring the amount resolved by Graybar and Braun). Prior to Graybar's complaint, West Bay had forwarded two checks payable jointly to Braun and Graybar totaling $259,000. But Braun requested, with Graybar's acceptance, that West Bay issue two new checks in the place of, and in different amounts than, the two checks West Bay had already forwarded (but still totaling $259,000): one check for $186,000, the amount that Braun and Graybar indisputably agreed was due Graybar; and the other check for the $73,000 that Braun disputed was owed Graybar (the $73,000 check was to be held in trust by Graybar's counsel, pending Braun and Graybar resolving this dispute). West Bay refused to issue these requested new checks, and this refusal eventually resulted in Graybar's complaint against West Bay (and, in turn, West Bay's indemnity cross-complaint against Braun).

One could argue that since Braun already possessed two jointly payable checks from West Bay totaling $259,000, Braun and Graybar could simply have divided this total amount into the amount Braun and Graybar did not dispute ($186,000), and the amount they did ($73,000). The problem is, West Bay and Braun had further agreed that the joint checks issued by West Bay would detail what they covered. West Bay's two checks did not provide this detail, and West Bay refused to provide it; in fact, there was evidence that West Bay would not comply because "Braun [would] only use [the accountings] against [West Bay] in future litigation."

7

As noted, the trial court ruled that the Paragraph B indemnity provision was inapplicable because (1) West Bay's indemnity claim was not " 'as a result of' [Braun's] work," and (2) West Bay made a "willful and intentional decision not to pay Graybar." The trial court found "that West Bay had numerous opportunities to pay at least the [undisputed] amount of money to which Graybar was entitled at the time Graybar assert[ed] its [$259,000] claim—money which West Bay clearly and admittedly owed pursuant to the terms of the [West Bay-Braun] Subcontract, to either Braun or Graybar, or both jointly—but West Bay refused and failed to do so.  Braun repeatedly directed West Bay to issue payment, either to Graybar or jointly to Graybar and Braun, but West Bay failed to do so. . . .  [¶] . . . [¶] . . .  Accordingly, West Bay's willful misconduct takes this matter outside the express provisions of Paragraph B of the [West Bay-Braun] Subcontract [and] . . . West Bay failed to carry its [indemnity cross-complaint] burden of proving that Graybar's claim was 'as a result of' Braun's work [(as also specified in Paragraph B of the West Bay-Braun Subcontract)]."  Although West Bay, at trial, offered several reasons for its nonpayment to Braun and Graybar as the latter two requested pursuant to the joint check agreement—e.g., defective materials, water intrusion; West Bay had to issue joint checks to other Braun vendors; Braun abandoned the project; a failure to provide lien releases—the trial court rejected each of these reasons, citing evidence in its statement of decision to support these rejections.[2]

As we see it, on the one hand, Graybar's $259,000 claim for electrical supplies is obviously linked with Braun's electrical subcontract work.  In this sense, then, West Bay's indemnity claim against Braun is based on Braun's "work," within the meaning of Paragraph B of the West Bay-Braun subcontract.  On the other hand, however, West

---

[2]  As noted, in early 2006, while the West Bay-Braun/Graybar $259,000 dispute was still ongoing, the District informed West Bay that the District would make no further payments to West Bay until water intrusion issues were resolved.

Bay's indemnity claim is based not on what Braun actually did or did not do in its "work," but on what West Bay did: unjustifiably refusing to pay Braun/Graybar in a manner acceptable under their joint check agreement. In this sense, then, West Bay's indemnity claim against Braun is not based on Braun's "work," but rather on West Bay's own "willful misconduct," within the meaning of Paragraph B. As Paragraph B's drafter, West Bay must bear the brunt of this ambiguity.[3] (Civ. Code, § 1654.)

We conclude the trial court properly denied West Bay's indemnity cross-complaint against Braun under Paragraph B of its subcontract. In short, one cannot be held harmless if one has been held harmful.

As for Paragraph G, West Bay contends the trial court abused its discretion in denying West Bay's motion to amend its indemnity cross-complaint (purportedly to conform to proof) to explicitly cite Paragraph G as an applicable indemnity provision. The trial court noted West Bay's exclusive reliance on Paragraph B until the last minute of the Phase 1 litigation. It matters not, though. Paragraph G's more specific indemnity provision governing supplied materials runs aground, as did Paragraph B, on the joint check agreement-based conclusion that one cannot be held harmless if one has been held harmful. [4]

---

[3] In its reply brief, West Bay argued, for the first time, that "willful misconduct" is a tort concept and therefore the trial court erred in applying the term in a contractual context. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." (*Varjabedian v. Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) Accordingly, we do not consider the issue here to any greater extent than we already have.

[4] We address two other points that West Bay raises.

First, West Bay contends the trial court's finding that West Bay made a "willful and intentional decision not to pay Graybar" is "irrelevant and unsupported." As for "irrelevant," we disagree in light of what we have just said above. As for "unsupported," all West Bay can muster in its argument on appeal is "the undisputed fact that West Bay *did* pay Braun—more than $4 million over the course of the project," and that "in April

9

## II. The Trial Court Properly Denied Arbitration

Pursuant to their subcontract, West Bay moved to compel Braun to arbitrate their Phase 2 trial for Braun's alleged delay damages. But West Bay did so (1) only after it lost the Phase 1 trial (its indemnity claim against Braun); (2) only after it began the jury trial of Phase 2 (for which the trial court declared a mistrial because the Phase 2 trial was running out of alternate jurors); and (3) only after it allowed Braun to continue to prepare for the Phase 2 retrial by revising and submitting a new trial brief, jury instructions, and a neutral statement of the case.

The trial court denied West Bay's arbitration motion, finding that West Bay had "effectively waived" arbitration.

---

2005, West Bay paid Braun to resolve fully Graybar's claim, by giving [Braun] two checks, for a total of [$259,000], payable jointly to Braun and Graybar. Braun failed to endorse and tender them to Graybar, however. Two months later, Graybar filed its Stop Notice, which became the focus of its complaint against West Bay." Preliminarily, we observe that the West Bay-Braun subcontract *totaled* $4.366 million; thus, West Bay's own admitted payment to Braun apparently still left an unpaid sum to Braun greater than the $259,000 Graybar claimed it was owed for supplying electrical materials to Braun. More importantly, though, substantial evidence supports the conclusion that West Bay unjustifiably refused (1) to provide the $259,000 divided in the amounts specified by Braun and Graybar, and (2) to detail what the checks covered.

Second, West Bay complains the trial court foreclosed it from presenting evidence as to why it refused to pay Braun/Graybar. West Bay cites to a cross-examination exchange in which Braun's counsel successfully objected on relevance grounds to West Bay's question to a witness, "And what did you understand Quality Sound's scope of work to be on the project [(Quality Sound was another Braun subcontractor)]?" Braun's counsel explained, "Braun has not made an allegation our performance under the indemnity obligation was excused due to a lack of payment. [¶] Our understanding of [P]hase [1] of this trial was limited to Graybar payment claims and [West Bay's] indemnity claim for the Graybar payment claims. If we're going to get into Quality Sound, stop notices, and everything else—" Whatever this cryptic and confusing exchange demonstrates, the fact is that West Bay was allowed to litigate extensively its reasons for refusing to pay Braun/Graybar, as noted above. The trier of fact—here, the trial court—simply did not find that West Bay had proven those reasons.

10

The question of waiver is one of fact and we review a trial court's waiver finding under the substantial evidence standard of review. (*Augusta v. Keehn & Associates* (2011) 193 Cal.App.4th 331, 337.) The factors relevant to determining waiver include whether the party seeking arbitration (1) has taken steps inconsistent with that desire, (2) has unreasonably delayed in that quest, or (3) has acted in bad faith. (*Ibid.*)

West Bay contends it could not seek private arbitration of its Phase 2 dispute with Braun until it (West Bay) settled its claim in late August 2012 with the District, with whom West Bay did not have a private arbitration agreement. West Bay delayed in this way to prevent "conflicting rulings" on common legal and factual issues; a possibility of such conflicting rulings is a ground for denying a motion to compel agreement-based arbitration. (Code Civ. Proc., § 1281.2, subd. (c).)

The record shows, however, that a month passed from the time West Bay and the District entered their settlement into the court record until West Bay moved to arbitrate Phase 2 against Braun. And, during this time, the Phase 2 trial proceeding was moving forward with Braun engaging in much trial work. Given this, and West Bay's belatedness noted at the outset of this part of the Discussion, the trial court's waiver finding was supported by substantial evidence. West Bay's motion to compel arbitration reasonably can be viewed more as an opportunistic attempt at forum shopping than a genuine request for arbitration; indeed, West Bay would enjoy nothing more than a ruling "conflicting" with the adverse determination in Phase 1.

We conclude the trial court properly denied West Bay's motion to compel arbitration.

11

### III. The Trial Court Should Have Stayed the
### Phase 2 Attachment Proceedings

After West Bay appealed from the Phase 1 judgment and also from the denial of its motion to compel arbitration, Braun obtained a $695,000 prejudgment writ of attachment against West Bay for the Phase 2 trial.

West Bay contends the trial court had to stay the attachment proceedings pending these two appeals. We agree.

Generally, including here, "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order." (Code Civ. Proc., § 916, subd. (a).)

"In determining whether a [trial court] proceeding is embraced in or affected by [an] appeal, we must consider the appeal and its possible outcomes in relation to the proceeding and its possible results. '[W]hether a matter is "embraced" in or "affected" by a judgment [or order] within the meaning of [Code of Civil Procedure] [section 916] depends on whether postjudgment [or postorder] proceedings on the matter would have any effect on the "effectiveness" of the appeal.' [Citation.] 'If so, the proceedings are stayed; if not, the proceedings are permitted.' " (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189 (*Varian*).)

One way in which a trial court proceeding can affect the effectiveness of an appeal is if the possible outcomes on appeal and the actual or possible results of the trial court proceeding are irreconcilable. (*Varian*, *supra*, 35 Cal.4th at p. 190.) That is the case here with respect to West Bay's appeal of the Phase 1 indemnity judgment in favor of Braun. As Braun itself acknowledges, "if the Court [of Appeal] wholly reverses the trial court's decision in Phase 1 as to Braun's indemnity obligations, [West Bay] will claim its right to

12

indemnity as an offset to its potential liability to Braun in Phase 2." This offset, depending on its amount, would either reduce the amount of the attachment or eliminate entirely Braun's right to attachment. (See Code Civ. Proc., § 484.090, subd. (a) [delineating the findings required to establish attachment and the amount of attachment].)

A second way in which a trial court proceeding can affect the effectiveness of an appeal is if the very purpose of the appeal is to avoid the need for the trial court proceeding. (*Varian*, *supra*, 35 Cal.4th at p. 190.) Again, that is the case here—this time, with respect to West Bay's appeal of the order denying it arbitration. If we were to reverse this order on appeal, the Phase 2 West Bay-Braun dispute would be arbitrated rather than tried, and West Bay notes that its arbitration agreement with Braun potentially gives the arbitrator the power to deploy "interim measures" to preserve assets (which possibly encompasses attachment). These "interim measures" distinguish the present case from *Loeb & Loeb v. Beverly Glen Music, Inc.* (1985) 166 Cal.App.3d 1110, relied on by Braun. In *Loeb* the appellate court upheld a trial court order granting a prejudgment writ of attachment, notwithstanding the matter was stayed pending arbitration. *Loeb* noted that a trial court has the authority to decide ancillary matters not subject to arbitration. (*Id.* at p. 1117.)

We reverse the order granting Braun the prejudgment writ of attachment.[5]

### IV.  The Trial Court Properly Found the Braun-Graybar Judgment Was Satisfied

In October 2007, Braun and Graybar stipulated to a judgment against Braun for the principal amount of $243,000, resolving all claims between them.

---

[5] Given our reversal of the attachment order on the ground the trial court should have stayed the attachment proceedings pending the appeals of the indemnity judgment and the arbitration denial, we need not address West Bay's other contentions for reversing this order.

In the Phase 1 trial, Graybar sought, among other things, to recover this precise sum against West Bay, and prevailed. While West Bay's appeal of the Phase 1 trial was pending, West Bay settled with Graybar for $950,000, and Graybar assigned its stipulated judgment against Braun to West Bay (this left West Bay's appeal of the Phase 1 indemnity judgment in favor of Braun still remaining).

Later, when West Bay sought to enforce the Braun-Graybar stipulated judgment against Braun that Graybar had assigned to West Bay (and also when West Bay claimed this judgment amount should be offset against any attachment amount Braun could obtain in the Phase 2 trial), Braun moved successfully to have this judgment deemed satisfied pursuant to the West Bay-Graybar settlement payment on appeal.

The trial court properly granted Braun's motion to have the Braun-Graybar stipulated judgment deemed satisfied in this way.

The Braun-Graybar stipulated judgment (that Graybar assigned West Bay as part of their settlement on appeal) stated in relevant part (paragraph numbering omitted):

" [West Bay] did not pay Braun for the [sub]contract balance due leaving Braun unable to pay Graybar.

"It is . . . agreed between [Braun and Graybar] that Braun's obligation to pay Graybar for the [electrical materials Graybar supplied] was unconditional, and that [West Bay's] failure to pay Braun for its work on the Project resulted in Braun not making timely payment to Graybar for the material provided to the Project. [¶] . . . [¶]

" . . . It is further agreed that the judgment shall be in the amount of [$243,000] plus interest . . . [and] costs . . . .

"On condition that [West Bay] makes payment to Braun of the amount of the materials calculated above, Braun agrees that West Bay may make payment to Graybar for the principal amount noted above . . . and that the total of said offset and the principal

14

amount paid . . . will be credited on a dollar-for-dollar basis against the principal amount of unpaid contract balance damages claimed by Braun against [West Bay] in this action."

In short, then, Braun owed Graybar the principal amount of $243,000 for materials Graybar supplied to Braun for the project. Braun failed to pay Graybar this amount because West Bay failed to pay Braun. West Bay paid this amount directly to Graybar pursuant to their settlement on appeal of their portion of the Phase 1 trial. Consequently, the Braun-Graybar stipulated judgment for this amount owed to Graybar has been satisfied. (And, pursuant to the terms of that stipulated judgment, West Bay will be credited this principal amount against the principal amount of unpaid contract balance damages that Braun obtains from West Bay, if any, in the Phase 2 trial.)

West Bay raises a couple of technical legal objections to such satisfaction: (1) The Braun-Graybar stipulated judgment did not state *explicitly* that the $243,000 would be reduced or modified if Graybar recovered against West Bay (the stipulated judgment effectively said as much, though, if West Bay paid Graybar directly); and (2) Graybar had a separate and independent judgment against Braun (effectively, no it did not, if West Bay paid Graybar directly). Furthermore, West Bay on appeal does not dispute the basic facts set forth in the preceding paragraph, which trump such legal technicalities in any event.

We conclude the trial court properly found the Braun-Graybar stipulated judgment has been satisfied.

### CONCLUSION

The "consistent" and "commonsense" case that Graybar presented against West Bay—terms the trial court used in characterizing the Phase 1 trial—is grounded in the joint check agreement of West Bay, Braun and Graybar. Substantial evidence shows that West Bay unjustifiably refused to pay under this agreement pursuant to directions from

15

Braun and Graybar.  Consequently, Graybar successfully sued West Bay, because West Bay did not pay Graybar pursuant to the joint check agreement.  West Bay unsuccessfully sued Braun for indemnity, because Braun's failure to pay Graybar was based on West Bay's failure to pay Braun pursuant to the joint check agreement.  And the stipulated judgment between Braun and Graybar was satisfied by West Bay's settlement payment to Graybar, as the stipulated judgment contemplated that West Bay could directly pay Graybar this amount.

## DISPOSITION

The order granting Braun the prejudgment writ of attachment is reversed.  The judgment and the other two orders appealed from (arbitration denied; judgment satisfied) are affirmed.  Each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


      BUTZ      , J.


We concur:


      ROBIE      , Acting P. J.


      MURRAY      , J.

16